1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Diane M. Doolittle (Bar No. 142046)
2  dianedoolittle@quinnemanuel.com
   Rachel Herrick Kassabian (Bar No. 191060)
3  rachelkassabian@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
4  Redwood Shores, California  94065-2139
   Telephone:     (650) 801-5000
5  Facsimile:     (650) 801-5100

6  Daniel C. Posner (Bar No. 232009)
   danposner@quinnemanuel.com
7  865 S. Figueroa Street, 10th Floor
   Los Angeles, California  90017
8  Telephone:     (213) 443-3100
   Facsimile:     (213) 443-3100

9
   Attorneys for Defendants Yandex N.V., Yandex
10 Inc. and Yandex LLC

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

                        SAN FRANCISCO DIVISION
13

14 PERFECT 10, INC., a California corporation,        CASE NO. CV-12-1521 WHA (LB)

15              Plaintiff,                            **[REDACTED FOR PUBLIC FILING]**

16        vs.                                         **DEFENDANTS' OPPOSITION TO
                                                      PLAINTIFF PERFECT 10'S MOTION
17                                                    FOR PARTIAL SUMMARY JUDGMENT/
   YANDEX N.V., a Netherlands limited liability       SUMMARY ADJUDICATION RE: (i)
18 company; YANDEX INC., a Delaware                   DMCA COMPLIANCE OF SAMPLE
   corporation; and YANDEX LLC, a Russian            NOTICES; (ii) INELIGIBILITY OF
19 Limited Liability Corporation,                     DEFENDANTS FOR DMCA SAFE
                                                      HARBOR DEFENSE; AND (iii)
20              Defendants.                           SUFFICIENCY OF SAMPLE NOTICES
                                                      RE KNOWLEDGE FOR
21                                                    CONTRIBUTORY COPYRIGHT
                                                      INFRINGEMENT
22
                                                      Hon. William H. Alsup
23                                                    Date:  May 2, 2012
                                                      Time:  8:00 a.m.
24                                                    Ctrm:  8

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    THE COURT SHOULD DENY, OR DEFER RULING ON, PERFECT 10'S MOTION BECAUSE IT LACKS SUBJECT MATTER JURISDICTION ...........................6

II.   THIS COURT SHOULD DECLINE TO RULE ON PERFECT 10'S MOTION, OR DENY IT OUTRIGHT, AS IT WILL NOT MATERIALLY ADVANCE THIS LITIGATION OR NARROW THE ISSUES FOR TRIAL .......................................9

III.  PERFECT 10'S THREE SAMPLE DMCA NOTICES ARE DEFICIENT .......................10

    A.   Perfect 10 Has Not Met Its Burden of Providing the Court with All of the Material Facts on Its Motion ...................................................................10

    B.   Perfect 10's Three So-Called "Sample Notices" Are Defective ...............................12

        1.   Sample Notice 1 is Defective .......................................................13

        2.   Sample Notice 2 Is Defective .......................................................14

        3.   Sample Notice 3 is Defective .......................................................14

    C.   The Enormous Burden Yandex Incurred to Process These Defective Notices Confirms That the Notices Do Not Comply with the DMCA..................................15

    D.   Yandex's Good Faith Efforts To Process P10's Defective Notices Does Not Render Them Compliant ...................................................................16

IV.   YANDEX IS IN COMPLIANCE WITH THE REGISTERED DMCA AGENT REQUIREMENT ...................................................................17

    A.   The DMCA Requires Only That Yandex Have a Designated Agent – and It Does...................................................................17

    B.   Perfect 10's Motion Is Bereft of Support .......................................................19

    C.   Perfect 10 Omits The Glaring Fact That It Did Send, And Yandex Did Receive, Its Purported Notices .......................................................20

V.    PERFECT 10'S DEFECTIVE NOTICES DID NOT CONFER "ACTUAL KNOWLEDGE" OF INFRINGEMENT ...................................................................22

    A.   A Defective DMCA Notice Does Not Evidence An ISP's "Actual Knowledge"...................................................................22

    B.   Even If Perfect 10's Sample Notices Were DMCA-Compliant, They Cannot Establish Yandex LLC's And Inc.'s "Actual Knowledge" As A Matter of Law...................................................................24

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4
*Absher Const. Co. v. North Pacific Ins. Co.*,
2012 WL 13707 (W.D. Wash. Jan. 3 2012) ..........................................................6, 8

5

6
*Arista Records, Inc. v. MP3Board, Inc.*,
2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ....................................................16, 23

7
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................................................10

8

9
*Datatech Enterprises LLC v. FF Magnat Ltd.*,
2012 WL 4068624 (N.D. Cal. Sept. 14, 2012) ...............................................19, 22

10
*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ..................................................................................21

11

12
*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ...................................................................................................6

13
*In re Ford Motor Co./Citibank (S. Dakota), N.A.*,
264 F.3d 952 (9th Cir. 2001) ......................................................................................6

14

15
*Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*,
688 F. Supp. 2d 915 (N.D. Cal. 2010) .......................................................................8

16
*Hendrickson v. Amazon.Com, Inc.*,
298 F. Supp. 2d 914 (C.D. Cal. 2003) ......................................................................24

17

18
*Hendrickson v. eBay, Inc.*,
165 F. Supp. 2d 1082 (C.D. Cal. 2001) ..............................................16, 20, 22, 23

19
*ITSI T.V. Prods. v. California Auth. of Racing Fairs*,
785 F. Supp. 854 (E.D. Cal. 1992) .............................................................................7

20

21
*K2 America Corp. v. Roland Oil & Gas, LLC*,
653 F.3d 1024 (9th Cir. 2011) ....................................................................................8

22
*Lenz v. Universal Music Corp.*,
572 F. Supp. 2d 1150 (N.D. Cal. 2008) ...................................................................16

23

24
*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) ..................................................................................6

25
*Massey v. Zema Sys. Corp.*,
1998 WL 708913 (N.D. Ill. Sept. 30, 1998)............................................................11

26

27
*McNutt v. Gen. Motors Acceptance Corp. of Indiana*,
298 U.S. 178 (1936) ...................................................................................................6

28

*Minden Pictures, Inc. v. Pearson Educ., Inc.*,
   2013 WL 71774 (N.D. Cal. Jan. 7, 2013) ................................................6

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,
   210 F.3d 1099 (9th Cir. 2000)................................................10, 11

*Omega S.A. v. Costco Wholesale Corp.*,
   541 F.3d 982 (9th Cir. 2008)................................................6

*Palmer v. Braun*,
   376 F.3d 1254 (11th Cir. 2004)................................................6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007)................................................8

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007)................................14, 15, 16, 23, 24

*Perfect 10 v. Amazon.com*,
   487 F.3d 701 (9th Cir. 2007)................................................22, 23

*Perfect 10 v. Google*,
   Case No. CV-04-09484-AHM (C.D. Cal. July 26, 2010) ..............3, 11, 12, 13, 14, 15, 16, 23

*Potter v. Hughes*,
   546 F.3d 1051 (9th Cir. 2008)................................................8

*Rosen v. Hosting Services, Inc.*,
   771 F. Supp. 2d 1219 (C.D. Cal. 2010)................................................23

*Rundquist v. Vapiano SE*,
   798 F. Supp. 2d 102 (D.C. Cir. 2011)................................................7

*Subafilms Ltd. v. MGM-Pathe Comm'n Co.*,
   24 F.3d 1088 (9th Cir. 1994)................................................6

*Trea Senior Citizens League v. U.S. Dept. of State*,
   2013 WL 458297 (D.D.C. Feb. 7, 2013)................................................9

*Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*,
   813 F.2d 1553 (9th Cir. 1987)................................................6

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*,
   2013 WL 1092793 (9th Cir. March 14, 2013) ................................................24

*Viacom, International, Inc. v. YouTube, Inc.*
   718 F. Supp. 2d 514, 529 (S.D.N.Y. 2010) ................................................19, 20

## Statutes

17 U.S.C. § 512(c)................................................20

17 U.S.C. § 512(c)(2)................................................17, 18, 20

17 U.S.C. § 512(c)(3) ................................................................................................24

17 U.S.C. § 512(c)(3)(a)(ii) .......................................................................................13

17 U.S.C. § 512(c)(3)(a)(iii) ......................................................................................14

17 U.S.C. § 512(c)(3)(A)(ii) ......................................................................................13

17 U.S.C. § 512(c)(3)(A)(iii) .....................................................................................13

17 U.S.C. § 512(c)(3)(B)(i) ........................................................................................22

17 U.S.C. § 512(c)(3)(B)(ii) .......................................................................................24

17 U.S.C. § 512(d)(3) ...........................................................................................13, 14

28 U.S.C. § 1338 .........................................................................................................6

Fed. R. Evid. 402 .......................................................................................................13

Fed. R. Evid. 403 .......................................................................................................13

Fed. R. Evid. 602 .......................................................................................................13

Fed. R. Evid. 604 .......................................................................................................13

Fed. R. Evid. 802 .......................................................................................................13

Fed. R. Evid. 701 .......................................................................................................13

Fed. R. Evid. 702 .......................................................................................................13

Local Rule 7-3(a) .......................................................................................................13

Local Rule 7-5 ...........................................................................................................13

## **Miscellaneous**

*Report of the House Committee on Commerce on the Digital Millennium Copyright Act of 1998*
   ("House Report"), H.R. Rep. No. 105-551, at 49 (July 22, 1998) ...........................................18

Sen. Rep. No. 105-190, 105th Cong., 2d Sess. (May 11, 1998) ....................................................18

DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

1

**Preliminary Statement**

2        Perfect 10 has improvidently filed an early motion seeking rulings on a very narrow set of

3 its contributory infringement claims – but because the underlying direct infringements are

4 extraterritorial, this Court lacks subject matter jurisdiction over them, and need look no further to

5 deny Perfect 10's Motion. Moreover, the motion is a waste of this Court's resources, as it seeks a

6 ruling on just one element of one defense (DMCA safe harbor), and just one element of one claim

7 (contributory infringement) for just a tiny fraction – **<u>less than 1%</u>** – of the alleged infringements at

8 issue in this case. Its motion will not materially advance the resolution of the case, and Perfect 10's

9 failure to provide the Court with all of the material facts it will need to resolve these issues dooms

10 its motion. But even reaching the merits of Perfect 10's arguments, they fail.

11        *First*, Perfect 10 has cherry-picked three of its nearly 300 DMCA notices, and asks the Court

12 to deem them DMCA-compliant. They are not – including for many of the same reasons Perfect

13 10's notices have been invalidated before. Tellingly, Perfect 10 could identify the alleged

14 infringements by sending a simple list of URLs that can be quickly verified – as the vast majority of

15 other complainants do. Perfect 10 chooses instead to barrage service providers like Yandex with

16 confusing arrays of screenshots with embedded URLs which must be painstakingly mined to

17 process. Perfect 10 knows these notices dramatically slow down processing time – which Perfect

18 10 then exploits to trump up baseless lawsuits. The facial defects of the its three "sample notices,"

19 viewed in light of the complete factual record (which Perfect 10 has failed to provide), require

20 denial of its motion.

21        *Second*, Perfect 10 urges the Court to rule that Yandex is ineligible for DMCA safe harbor

22 prior to the date it formally registered a DMCA agent with the U.S. Copyright Office. But neither

23 the letter nor the spirit of the DMCA supports Perfect 10's argument. Yandex has been in

24 substantial compliance with the DMCA during the relevant time period. Nothing more is required.

25        *Third*, Perfect 10 insists that even if its three sample notices are deficient, they nevertheless

26 conferred actual knowledge of infringement for purposes of imposing contributory liability. But as

27 Perfect 10 well knows, having litigated and lost this issue before, deficient DMCA notices may not

28

Case No. CV-12-1521-WHA
DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

1   even be *considered* as evidence of a service provider's "knowledge" of infringement.  Perfect 10's

2   motion should be denied in full.

3   **Statement of Relevant Facts**

4   **Perfect 10**.  Perfect 10 is an adult entertainment company.  First Am. Compl. (Dkt. 88) ¶ 10.

5   It operates a subscription-based website peddling images of nude women.  *Id.* at ¶¶ 14-16.  Perfect

6   10 devotes nearly its entire business to copyright litigation, and has been described as a copyright

7   troll.  Perfect 10 has filed at least 32 copyright lawsuits against more than 40 different entities in

8   recent years, and has accused nearly all of them of causing its financial ruin.  Declaration of Rachel

9   Herrick Kassabian, filed May 14, 2012 (Dkt. 19-1, 2) ¶ 2 & Exs. 1, 2, 4-8, 15.

10  **The Yandex Defendants**.[1]  Yandex N.V. is a Dutch holding company that invests in various

11  Internet and technology-related businesses.  Declaration of Charles Ryan, filed herewith ("Ryan

12  Decl.") ¶¶ 1, 5.  Since May 2011, Yandex N.V. has been listed on the NASDAQ Global Select

13  Market exchange, which includes public companies that meet the highest listing standards in the

14  world.  Declaration of Dmitry Barsukov, filed herewith ("Barsukov Decl.") ¶ 11.  Yandex N.V. is

15  the worldwide parent of the Yandex companies, including Yandex LLC, which offers a broad range

16  of search, location-based, personalized and mobile services that are free to users and that enable

17  them to find information and communicate over the Internet from desktops and mobile devices.  *See*

18  *id.* ¶¶ 1, 12-14; Ryan Decl. ¶ 5.  Yandex N.V.'s business is managing its investments.  *Id.* ¶¶ 5, 9.

19  Contrary to Perfect 10's claim, Yandex N.V. does not own or operate any Internet websites.  *Id.* ¶ 8.

20  Yandex LLC, Yandex N.V.'s largest subsidiary, operates yandex.ru, the most popular search

21  engine and most visited website in Russia.  Barsukov Decl. ¶¶ 1, 3, 12, 14.  The vast majority of

22  yandex.ru's users are located in Russia.  Declaration of Tatiana Bakharevskaya, filed herewith

23  ("Bakharevskaya Decl.") ¶ 11.  Yandex LLC also provides search results and support services for

24  an English-language search engine, yandex.com, the majority of whose users are also in Russia.  *Id.*

25  ¶¶ 9, 12. ██████████████████████████████████████████████████████████████.

26

27  ───────────────────
    [1]  For ease of reference only, "Yandex" or "the Yandex Defendants" as used herein refers to Yandex N.V., Yandex LLC and/or Yandex Inc.

28

*Id.* ¶¶ 11-12.  Yandex LLC also operates user-generated content hosting sites, such as Narod (a site-hosting service) and Fotki (a photo hosting service).  Barsukov Decl. ¶¶ 16-17.

Defendant Yandex Inc., another Yandex N.V. subsidiary, is a Delaware corporation located in Palo Alto.  Declaration of Arkady Borkovsky, filed herewith ("Borkovsky Decl.") ¶ 3.  Yandex Inc. employs a small staff of eight engineers and provides software development services to Yandex LLC.  *Id.* ¶¶ 4-5.  Yandex Inc. does not own or operate any search engines.  *Id.* ¶¶ 5-7.

**Perfect 10's History of Sending Deficient DMCA Notices**.  Perfect 10 has a well-documented history of sending defective DMCA notices to various service providers, and then suing them after they encountered difficulty or delays in complying with the defective notices.  Several courts have invalidated these notices in the subsequent litigations.  *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 (9th Cir. 2007) (holding that Perfect 10's "communications" to the defendants, which included thousands of pages of "pictures with URLs of Perfect 10 models allegedly posted on [the defendants'] websites . . . do not substantially comply with the requirements of" the DMCA).  In particular, notices similar to those Perfect 10 sent to Yandex here were invalidated in Perfect 10's case against Google.  *See* Declaration of Rachel Herrick Kassabian, filed herewith ("Kassabian Decl."), ¶¶ 5-6 and Ex. B (*Perfect 10 v. Google*, Case No. CV-04-09484-AHM, Dkt. 937 at 12-25 (C.D. Cal. July 26, 2010) ("*Perfect 10/Google* July 26, 2010 Order") (invalidating Perfect 10 notices to Google consisting of numerous pages of PDF screenshots of search results and third party web pages, which were included on hard drives, DVDs, CDs and electronic file attachments)).

**Perfect 10's Notices to Yandex.**  Since October 2011, Perfect 10 has sent nearly 300 DMCA notices, comprising more than 16,000 pages of screenshot-style PDF files, to Yandex.  Kassabian Decl. Ex. D ("Notice of Infringements" folder); Declaration of Maria Grigorieva, filed herewith ("Grigorieva Decl.") ¶¶ 10-11.  These notices were sent to the email address used by engineers in Yandex's infrastructure department instead of to Yandex's customer support email addresses, creating significant confusion and delay.  Grigorieva Decl. ¶ 10.  The notices consist of cover emails or letters complaining about Yandex-branded search services, accompanied by large collections of screenshots –often several dozen or several hundred pages long – with thousands of

embedded URLs.  *Id.* ¶¶ 11-13.  Although the notices do not purport to complain of any content

hosted by Yandex, in fact, buried within some of them are URLs associated with user-generated,

Yandex-hosted content.  Declaration of Pavel Byvshih, filed herewith ("Byvshih Decl.") ¶¶ 12-13.

The screenshots are rife with defects, including incomplete URLs, top-level domain URLs which do

not specify the offending page, and unverifiable links.  *Id.* ¶ 14.  Other notices do not provide the

URLs in a "copy-and-paste" enabled format, and still others complain about celebrity images to

which Perfect 10 has no rights.  *Id.*  Another "notice" consists of nothing but a two-sentence cover

email and thumbnail images, and another contains screenshots of a third-party website that has no

connection to Yandex.  *See, e.g.*, Grigorieva Decl. ¶¶ 17, 23.  Perfect 10 often sent multiple notices,

as many as 22 in a single day, within a space of minutes or hours.  *Id.* ¶¶ 11-12, 20.

**Yandex's Processing of Perfect 10's Deficient and Misdirected DMCA Notices**.  Once

Perfect 10's misdirected notices were routed to the correct personnel, Yandex's search services

support team reviewed them.  *Id.* ¶ 13.  In every instance, the cover emails complained *only* about

infringements relating to Yandex's image or search services.  *Id.*  Because Russian law does not

require search engines to suppress search results linking to allegedly infringing materials, nor were

Yandex's systems equipped to do so, there was nothing for Yandex to do in response to Perfect 10's

notices.[2]  *Id.*; Declaration of Elena Voinikanis, filed herewith ("Voinikanis Decl."), ¶ 15.

When a subsequent examination of the notices revealed some Yandex-*hosted* materials

buried under the thousands of search results, ██████████████████████████████████████

████████████████████████████  and also manually reviewed the notices for URLs on Yandex-hosted

services.  Byvshih Decl. ¶¶ 13-15.  Where possible, identified URLs were copied and pasted, one at

a time, for processing.  *Id.* ¶ 13.  Others had to be retyped character-for-character, because some of

Perfect 10's notices lacked copy-paste capabilities.  *Id.*  Where URLs were incomplete, Yandex

employees nevertheless attempted to locate the complained-of content.  *Id.*  Yandex spent many

---

[2]   Because Perfect 10's early notices to Yandex complained that Yandex was hosting allegedly
infringing thumbnail copies of its images in Yandex-branded image search results, Yandex
informed Perfect 10 that its complaints were not well taken, in light of court rulings construing such
copies to be a fair use.

1   days processing Perfect 10's defective notices in this painstaking way. *Id.* Whereas on average it

2   takes a Yandex employee ████████████████████, it sometimes took a full

3   workday to process a single Perfect 10 notice. *Id.* ¶¶ 15-16.  As new systems Yandex

4   commissioned to suppress search results came online, Yandex reprocessed all of Perfect 10's

5   notices, for both yandex.com and yandex.ru image and web search.  Grigorieva Decl. ¶¶ 14-16.

6   Yandex has repeatedly requested that Perfect 10 prepare its notices in a comprehensible

7   manner.  Perfect 10 has ignored those requests.  *See* Byvshih Decl. ¶ 16.   Despite the difficulties in

8   processing Perfect 10's obfuscatory notices, Yandex has nevertheless managed to remove more than

9   70,000 links from Yandex-branded search results.  Grigorieva Decl. ¶ 16.

10   **Yandex's Processing of the Three Sample Notices.**  As with the other Perfect 10 notices,

11   Yandex processed the sample notices on which Perfect 10 bases its motion.  Although they suffer

12   from many of the defects recounted above, including incomplete URLs and links that could not be

13   confirmed, Yandex suppressed more than 150 discernible URLs from its search results based on its

14   review of the three sample notices.  *See*, *e.g.*, Grigorieva Decl. ¶¶ 18-20; & Exs. E-G; Byvshih

15   Decl. ¶ 19.  Yandex continues to process Perfect 10's notices as they arrive.  When Yandex receives

16   a notice directed to either yandex.com or yandex.ru, Yandex nevertheless processes the notices for

17   both websites, and for both web and image search.  *E.g.*, Grigorieva Decl. ¶¶ 21-24.

18   **Yandex's Formal Designation of a DMCA Agent.**  Yandex has had copyright complaint

19   procedures in place for all its relevant services since before Perfect 10 sent its first notice in October

20   2011.  Grigorieva Decl. ¶ 7.  Users could complain about hosted copyrighted content by following

21   the procedure stated at help.yandex.ru/common, and submit a complaint at

22   feedback.yandex.ru/search.  Grigorieva Decl. ¶ 7; Byvshih Decl. ¶ 8.  On or about October 12,

23   2012, Yandex LLC formally registered a DMCA agent with the U.S. Copyright Office.  Grigorieva

24   Decl. ¶ 29.  Yandex Inc. formally registered a DMCA agent on August 22, 2012.  *Id.* ¶ 30 & Ex. J.

25

26

27

28

### Argument

**I.     THE COURT SHOULD DENY, OR DEFER RULING ON, PERFECT 10'S MOTION BECAUSE IT LACKS SUBJECT MATTER JURISDICTION**

As a threshold matter, the Court need not reach the merits of Perfect 10's motion because subject matter jurisdiction is lacking for the vast majority – **94%** – of alleged infringements Perfect 10 raises in its motion.  "The party asserting federal jurisdiction," Perfect 10 in this case, "bears the burden of proving the case is properly in federal court." *In re Ford Motor Co./Citibank (S. Dakota), N.A.*, 264 F.3d 952, 957 (9th Cir. 2001).  Where questions about subject matter jurisdiction exist, "[f]ederal courts are under an independent obligation to examine their own jurisdiction." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), *overruled on other grounds*, 493 U.S. 215 (199); *see also McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936) (district court "is vested with authority to inquire at any time" whether jurisdiction exists).

When a court's jurisdiction over a plaintiff's claims is uncertain, dispositive motions on those claims should be deferred until such time as the plaintiff has demonstrated that jurisdiction in fact exists. *See Absher Const. Co. v. North Pacific Ins. Co.*, 2012 WL 13707, *8 n.10 (W.D. Wash. Jan. 3 2012) ("The court will defer ruling on [plaintiff] Absher Pacific's motion for partial summary judgment with respect to the Defendants' duty to defend . . . until after the court receives the parties' briefs concerning the court's subject matter jurisdiction and resolves that issue.").  Where the defendant makes a factual challenge to subject matter jurisdiction, the plaintiff "must come forward with evidence outside his pleadings to support his jurisdictional allegation." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987).

In the copyright context, federal courts lack subject matter jurisdiction over infringement claims that concern extraterritorial conduct because the Copyright Act "presumptively does not apply to conduct that occurs abroad even when that conduct produces harmful effects within the United States." *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 988 (9th Cir. 2008); *see also* 28 U.S.C. § 1338 (giving federal courts original jurisdiction over cases arising under the Copyright Act); *Subfilms Ltd. v. MGM-Pathe Comm'n Co.*, 24 F.3d 1088, 1098 (9th Cir. 1994) ("[W]e reaffirm that the United States copyright laws do not reach acts of infringement that take place

entirely abroad."); *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004) ("[I]t is only where an infringing act occurs in the United States that the infringement is actionable under the federal Copyright Act, giving the federal courts jurisdiction over the action.").[3]

Here, Perfect 10 has moved for partial summary judgment on a tiny fraction of its contributory infringement claims. Perfect 10's theory is that Defendants should be held contributorily liable for linking to third-party websites which display infringing content, and including those links in search results in response to user queries. *See* First Am. Compl. ¶¶ 27, 39-41.[4] Thus, for subject matter jurisdiction to lie, Perfect 10 must show that the underlying third-party direct infringements occurred in the United States. *See, e.g., Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 126-27 (D.C. Cir. 2011) (in context of contributory liability, "[a]t least one act [of direct infringement] must take place in the United States to trigger the protection of United States law and the subject matter jurisdiction of this Court"); *ITSI T.V. Prods. v. California Auth. of Racing Fairs*, 785 F. Supp. 854, 864 (E.D. Cal. 1992), *rev'd in part on other grounds*, 3 F.3d 1289 (9th Cir. 1993) ("To satisfy the jurisdictional requirement that the defendant committed an act of infringement in

---

[3]   As this Court recognized recently, "[t]here is a split in authority as to whether the extraterritoriality question is jurisdictional in nature, or should instead be analyzed in terms of whether the extraterritorial acts state a claim for infringement." *Minden Pictures, Inc. v. Pearson Educ., Inc.*, 2013 WL 71774, at * 2 (N.D. Cal. Jan. 7, 2013) (citing *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1367-68 (Fed. Cir. 2008)). In *Minden Pictures*, this Court assumed that the extraterritoriality question is jurisdictional. *Id.* But even if the question instead concerns an element of a claim for copyright infringement, however, it still presents a threshold issue that can serve to bar an infringement claim entirely, and thus it is appropriate for the Court's consideration at this stage, before ruling on Perfect 10's premature motion for summary adjudication. *See Litecubes*, 523 F.3d at 1366 n.14 (noting that even if not jurisdictional, "[f]oreign litigants nevertheless have substantial protection if the activity complained of took place wholly outside of the United States," because the issue often can be "quickly disposed of" through early motions).

[4]   In its complaint, Perfect 10 raises its claims against the three Yandex entities collectively, and it does nothing to distinguish how its claims differ as to each. *E.g.*, First Am. Compl. ¶ 27. Perfect 10 thus overlooks that Yandex N.V. and Yandex Inc. indisputably do not own or operate the services that Perfect 10 alleges have contributed to copyright infringement of its works. *See* Ryan Decl. ¶ 8; Borkovsky Decl. ¶ 6. Nor does Yandex Inc. provide server space for any alleged Perfect 10 infringements, as Perfect 10 accuses it of doing. Borkovsky Decl. ¶ 7; Bakharevskaya Decl. ¶¶ 7-9. Perfect 10 has made no showing at all that it has valid claims against either Yandex Inc. or Yandex N.V. Regardless, because Perfect 10's claims fail against Yandex LLC, they likewise fail against Yandex N.V. and Yandex Inc.

1   the United States, the plaintiff must show only that the direct act of infringement for which

2   defendant is contributorily or vicariously liable occurred in the United States.").

3        Perfect 10 has not made this showing.  To the contrary, the record reflects that at least **94%**

4   of the alleged underlying third-party direct infringements at issue in Perfect 10's three sample

5   DMCA notices occurred abroad.  Specifically, Defendants have reviewed each of the discernible

6   URLs in Perfect 10's three sample notices using "Domaintools.com," which is the same tool Perfect

7   10's CEO Norman Zada claims to have used to ascertain owner and location information for

8   websites.  *See* Dkt. 21-1 at ¶¶ 11, 13, 14; Declaration of Geoffrey Grundy, filed herewith ("Grundy

9   Decl.") ¶ 3.  This process confirmed that *of the 164 URLs identified in the sample notices, the*

10  *corresponding IP Addresses for 154 of them are located outside the United States*.  Grundy Decl.

11  ¶ 6.  Thus, under the Ninth Circuit's "server test," these foreign-hosted infringements are

12  extraterritorial and not actionable.  *See Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1162

13  (9th Cir. 2007) ("it is the website publisher's computer, rather than [the search engine's] computer,

14  that stores and displays the infringing image").

15        Yandex recently served discovery requests asking Perfect 10 to produce all documents

16  showing the location of the alleged underlying third-party direct infringements.  Once Perfect 10

17  responds, Yandex intends to file a Rule 12(b)(1) motion to dismiss Perfect 10's claims for lack of

18  subject matter jurisdiction.  Even before then, this Court has the authority to order Perfect 10 to

19  show cause why its case should not be dismissed for lack of subject matter jurisdiction.  Indeed, this

20  Court has done just that in an earlier case in which, as here, the factual record suggested that the

21  plaintiff's claims concerned extraterritorial conduct over which the Court lacked subject matter

22  jurisdiction.  *See Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 921 (N.D.

23  Cal. 2010) (Alsup, J.) (raising issue of extraterritorial jurisdiction *sua sponte* before considering

24  merits of plaintiff's motion for summary judgment, and issuing OSC re jurisdiction).  In any case,

25  this jurisdictional issue should be addressed before reaching the merits of Perfect 10's motion.  *See*

26  *id*. (the question "[w]hether [a] plaintiff is entitled to summary judgment . . . must yield to a

27  separate inquiry [regarding] issues of comity and extraterritorial jurisdiction"); *see also*, *e.g.*, *K2*

28  *America Corp. v. Roland Oil & Gas*, LLC, 653 F.3d 1024, 1033 (9th Cir. 2011) ("If the case does

1   not clear the threshold of federal subject matter jurisdiction, any issue as to [the viability of the

2   claims] is academic.") (quotation omitted); *Potter v. Hughes*, 546 F.3d 1051, 1061 (9th Cir. 2008)

3   (similar); *Absher Const.*, 2012 WL 13707 at *8 (deferring ruling on motion for partial summary

4   adjudication pending *sua sponte* determination of subject matter jurisdiction).

5        Accordingly, because the facial extraterritoriality of Perfect 10's claims raises, at a

6   minimum, substantial questions about the Court's jurisdiction to entertain this dispute and decide

7   Perfect 10's motion, the Court should deny it, or at least hold it in abeyance, until such time as

8   Perfect 10 has met its burden of establishing that subject matter jurisdiction exists.

9   **II.     THIS COURT SHOULD DECLINE TO RULE ON PERFECT 10'S MOTION, OR
             DENY IT OUTRIGHT, AS IT WILL NOT MATERIALLY ADVANCE THIS**
10  **        LITIGATION OR NARROW THE ISSUES FOR TRIAL**

11       Perfect 10's motion should be denied for the additional reason that it imposes a substantial

12  burden on the Court without the prospect of advancing the case in any material respect.  Indeed,

13  Perfect 10's motion addresses only a tiny fraction of the issues in the case:  (i) one element

14  (designated agent) of one affirmative defense (DMCA safe harbor), over one time period (October

15  2011 to August 2012); (ii) the validity of **1/100** of the total number of DMCA notices at issue

16  representing less than **1/500** of the alleged infringements; and (iii) part of one element (knowledge)

17  of one claim (contributory infringement), with respect to **1/100** of the DMCA notices at issue.

18       This motion exemplifies inefficient, piecemeal litigation.  It will not resolve even a single

19  element entirely, let alone an entire claim or defense.  Moreover, Perfect 10's sample notices are not

20  representative of its hundreds of others, such that the Court will eventually need to consider them all

21  to rule on notice and knowledge.  *See* section III A, *infra*.  Likewise, to resolve any of Perfect 10's

22  claims or Yandex's affirmative defenses, the Court will need to consider all of the relevant material

23  elements, not just a small part of one element, as Perfect 10 has put at issue here.

24       To promote judicial efficiency, Yandex gave Perfect 10 the opportunity to withdraw its

25  motion.  Kassabian Decl., Ex. I.  Yandex warned Perfect 10 that if it declined to do so, Yandex

26  would request that the Court consider this to be Perfect 10's one and only motion for summary

27  judgment in the case.  Perfect 10 declined.  *Id.*  Thus, in the interests of judicial economy, it should

28  be held to just this one summary judgment motion for the duration of the case, or strictly limited to

1  filing future summary judgment motions only with leave of Court upon a showing of good cause.

2  *See, e.g.*, *Trea Senior Citizens League v. U.S. Dept. of State*, 2013 WL 458297, at *2 (D.D.C. Feb.

3  7, 2013) (directing party to "file a summary judgment motion that addressed all of the documents at

4  issue to avoid piecemeal litigation in this case").

5  ## III.    PERFECT 10'S THREE SAMPLE DMCA NOTICES ARE DEFICIENT

6         Perfect 10 asks the Court to find that three sample notices are DMCA-compliant.  Perfect 10

7  has failed to proffer the evidence the Court would need to make such a finding, and its motion

8  should be denied for this reason alone.  In any event, these notices are deficient, including for many

9  of the same reasons Perfect 10's notices have been invalidated in other cases.

10        ### A.    Perfect 10 Has Not Met Its Burden of Providing the Court with All of the
           Material Facts on Its Motion

11

12        Perfect 10 cherry-picked three purported sample notices from amongst the hundreds it has

13 dumped on Yandex over the course of more than a year, and asks the Court to rule, without the

14 benefit of context or a full factual record, that these three notices are DMCA-compliant.  In making

15 this request, Perfect 10 omits many material facts which, when properly considered, show that

16 Perfect 10 has wholly failed to meet its burden of showing no genuine dispute of material fact on its

17 argument that its sample notices are compliant with the DMCA.  *See, e.g.*, *Celotex Corp. v. Catrett*,

18 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d

19 1099, 1102 (9th Cir. 2000) ("A moving party without the ultimate burden of persuasion at trial . . .

20 has both the initial burden of production and the ultimate burden of persuasion on a motion for

21 summary judgment.").  Among other material facts Perfect 10 fails to disclose are the following:

22        (1)    The same day Perfect 10 sent "Sample Notice 1," it sent 12 other notices  – a total of

23 225 pages of screenshots with buried URLs – all in the span of ***10 minutes***.  Kassabian Decl. Ex. C.

24        (2)    The same day Perfect 10 sent "Sample Notice 2," it sent 11 other notices – a total of

25 nearly 500 pages of screenshots with buried URLs – all in the span of ***6 minutes.***  *Id.* Ex. D.

26        (3)    The same day Perfect 10 sent "Sample Notice 3," it sent 21 other notices – a total of

27 more than 500 pages of screenshots with buried URLs – all in the span of ***5 hours***.  *Id.* Ex. E.

28

(4)      The three sample notices are not representative of Perfect 10's hundreds of other notices.  For example, some of Perfect 10's notices to Yandex (i) are more than 275 pages in length, *see* Grigorieva Decl. ¶¶ 12, 21 & Ex. H; (ii) complain about alleged infringement of images of celebrities with whom Perfect 10 has no relationship (such as Christina Aguilera and Angelina Jolie), regarding images Perfect 10 admittedly does not own, *id.* ¶ 12, and Kassabian Decl. ¶ 12 & Ex. F -2; (iii) complain about alleged infringement of images that Yandex does not host or link to at all, *id.* ¶ 17 & Ex. D; and/or (iv) do not contain a *single one* of the required elements of a valid DMCA notice, in that they consist of a blank cover email and an attached .pdf file with various image and search result screenshots.  *Id.* ¶ 22; Grigorieva Decl. ¶17 & Ex. C.

(5)      In prior litigation, Perfect 10 was admonished for sending notices with broken, incomplete or otherwise unintelligible links.  *See* Kassabian Decl., Ex. B (*Perfect 10/Google* July 26, 2010 Order at 13 (notices that refer to "incomplete URLs . . . do not confer adequate notice under the DMCA").

(6)      In prior litigation, notices substantially indistinguishable from the sample notices (*i.e.*, email notices attaching 10-page electronic .pdf files of screenshots with buried URLs) were invalidated as impermissibly deficient.  *Id.* at 15-16 & Ex. A (Poovala Decl. & Ex. N13 thereto).

Perfect 10 effectively has admitted that its goal with this motion is to obtain an order that could serve to validate *all* its notices, because it claims the three sample notices are "representative."  Kassabian Decl., Ex. I.  They are not.  Grigorieva Decl. ¶¶ 22-24.  Moreover, Perfect 10 failed to point the Court to all the material evidence in the record relating to the claimed sufficiency of the three sample notices.  Indeed, when properly viewed in context, these notices are not discrete notices at all – they are ***small excerpts*** of much larger notices.  Thus, to evaluate the propriety of the three sample notices, they must be viewed in the context of the entire factual record – including the 45 other notices that Perfect 10 sent within minutes of the three on which it seeks a ruling, and Perfect 10's history of having notices invalidated.  By failing to present the Court with the complete factual record necessary to evaluate the propriety of the sample notices, Perfect 10 has failed to meet its burden of showing no genuine dispute of material fact.  Its motion on this issue should be denied for this reason alone.  *See*, *e.g.*, *Nissan Fire & Marine*, 210 F.3d at 1102; *see also*

1   *Massey v. Zema Sys. Corp.*, 1998 WL 708913, *14 (N.D. Ill. Sept. 30, 1998) (defendant failed to

2   show no genuine dispute of material fact on wage discrimination claim where data it "provide[d] an

3   incomplete picture from which to draw any reliable conclusion").[5]

4        **B.**     **Perfect 10's Three So-Called "Sample Notices" Are Defective**

5        Even if the Court elects to reach the merits of Perfect 10's motion regarding its sample

6   notices, it should be denied.  Perfect 10's primary argument is that its notices to Yandex are smaller

7   than those invalidated by prior courts, and thus, they should be found compliant.  But in fact,

8   Perfect 10 omits that several of its so-called "Group C Notices" to Google that were invalidated

9   were as short as eight pages long – comparable to the size of the sample notices here.  Kassabian

10   Decl. ¶¶ 7-8 & Ex. A.  But even if the notices to Google were on average larger than the Yandex

11   notices, all Perfect 10 has done here is break up a larger notice into smaller bits, and then bombard

12   Yandex with those bits all at once.  For instance, the day Perfect 10 sent Sample Notice 2, it sent 11

13   other notices – a total of nearly 500 pages of screenshots with buried URLs – all within the space of

14   ***6 minutes.***  *Id.* Ex. D at "July 15, 2012" folder.  Likewise, on January 27, 2012, Perfect 10 sent 22

15   notices totaling more than 500 pages; on January 28, 2012, Perfect 10 sent multiple notices totaling

16   nearly 900 pages of screenshots.  Grigorieva Decl. ¶¶ 11, 20.  This sleight-of-hand does not

17   distinguish these notices from the previously invalidated ones.

18        Nor is Perfect 10 correct that these notices must be compliant because they place all the

19   required elements in a single document.  In truth, all Perfect 10 has done is use the Adobe program

20   to connect various elements that it had previously sent as separate attachments or media.  The end

21   result is still the same, as Yandex still was obliged to hunt and peck amongst the myriad screenshots

22   for the required information.  The three sample notices are substantively indistinguishable, and

23   advance only Perfect 10's litigation goals, not any good faith takedown effort.  Perfect 10 could

---

24       [5]   Perfect 10's prior efforts to have a select few of its notices judged in a vacuum have failed.

25   Kassabian Decl. ¶ 16, Ex. H (Joint Status Report of Plaintiff Perfect 10, Inc. and Defendant Google, Inc.).  Additionally, Judge Matz permitted Google, as the bearer of the burden of proof on its

26   affirmative defenses, to be the moving party on DMCA safe harbor, and ruled on all of Perfect 10's notices together, rather than entertaining a series of piecemeal motions on individual elements or

27   notices, as Perfect 10 asks this Court to do.  *See Perfect 10 v. Google*, Case No. CV-04-09484-AHM, Dkts. 453, 937.

28

have sent Yandex an intelligible list of allegedly infringing URLs, along with the other notice requirements, but instead, it persisted in sending a barrage of screenshot style notices with buried URLs, impeding and delaying  processing efforts.  Perfect 10 should be held accountable for its election to send Yandex these obfuscatory screenshot-style notices in the face of prior court rulings invalidating them.  The particular deficiencies in each of the sample notices are outlined below.

## 1.    Sample Notice 1 is Defective

Sample Notice 1 is defective in several respects.  As a preliminary matter, it is not a notice at all, but rather a fragment of one.  *See* pp. 11-12, *supra*.  Further, this notice fails to adequately "identif[y] the copyrighted work claimed to have been infringed," 17 U.S.C. §§ 512(c)(3)(a)(ii), (d)(3), in that Perfect 10 provides only a *perfect10.com* screenshot purportedly containing "authorized copies of ***a number of*** the infringed images."  Zada Decl. Ex. 2, p. 1 (emphasis added).[6] Thus, Perfect 10 seeks to force Yandex to wade through numerous thumbnails in one section of its PDFs and compare them to dozens or hundreds of pages of screenshots of alleged infringements, to try to match them up.   This is precisely what Judge Matz found insufficient in the *Google* case.  *See* Kassabian Decl. Ex. B (*Perfect 10/Google* July 26, 2010 Order at 15-16 (finding that merely providing access to a catalog of Perfect 10 images "do[es] not identify the copyrighted work that was allegedly infringed")).  Perfect 10 further attempts to merge two requirements by contending in this notice that a URL included in Yandex search results is simultaneously an authorized display

---

[6]  Pursuant to Local Rule 7-3(a), Yandex objects to the Zada Declaration (Dkt. 105-1) on several grounds.  <u>*First*</u>, it is replete with legal conclusions that violate Fed. R. Evid. 701 and 702 and improper argument in violation of Local Rule 7-5.  *See*, *e.g.*, Zada Decl. ¶ 6 ("I specifically addressed every issue raised by the Central District per Judge Matz's July 26, 2010 summary judgment ruling"); Ex. 2, p. 3 (text box added to exhibit opines that DMCA notice complies with sections "512(c)(3)(A)(ii)" and "512(c)(3)(A)(iii)").  Yandex objects to the following portions on this basis:  ¶¶ 2, 4-8, 10, 14-16, 18-21, 25; Exs. 2-4, 6, 9-11, 16.  <u>*Second*</u>, Zada's declaration attaches and discusses unauthenticated documents, many of which also constitute inadmissible hearsay.  *See* Fed. R. Evid. 602, 802.  Yandex objects to the following portions on this basis:  ¶¶ 4, 17, 19, 20, 23-25; Exs. 1, 10,  14-16.  <u>*Third*</u>, Zada's purported translations of select portions of Russian documents are uncertified and lack proof of Zada's requisite qualifications to translate.  *See* Fed. R. Evid. 604.  Yandex objects to the following portions on this basis:  ¶¶ 5, 7, 8, 18; Exs. 2-4, 9.  <u>*Fourth*</u>, Yandex objects that the following portions of Zada's Declaration are speculative and/or lack foundation.  ¶¶ 2, 4-6, 7, 8, 11, 13-20, 23-25; Exs. 1-4, 6, 8-10, 11, 14-16.

and an alleged infringement. *See* Zada Decl. Ex. 2, pp. 3, 6 (stating that a single link, to a site in which Perfect 10 claims no right, identifies both the "copyrighted work" and the "infringing material"). A single thumbnail cannot be authorized and infringing at the same time, and the law requires Perfect 10 to make clear which is which. *CCBill*, 488 F.3d at 1113. This notice also fails to sufficiently identify the location of the allegedly-infringing materials. *See* 17 U.S.C. §§ 512(c)(3)(a)(iii), (d)(3). For instance, Perfect 10 buried URLs within lengthy screenshots, and included many top-level domains and "truncated" URLs which were rejected as deficient in *Google* and elsewhere. *See*, *e.g.*, Grigorieva Decl. ¶¶ 12,18; Zada Ex. 2, p. 6; *see also* Kassabian Decl., Ex. B (*Perfect 10/Google* July 26, 2010 Order at 23-24 (citing *CCBill*, 488 F.3d at 1113)).

### 2. Sample Notice 2 Is Defective

Sample Notice 2 is also defective. It is a fragment of a larger notice, pp. 11-12, *supra*, and does not adequately identify the copyrighted works. *See* Grigorieva Decl. ¶ 19; Zada Decl. Ex. 3, p. 1 ("I have attached authorized copies of **a number of** the infringed images.") (emphasis added); *id.* at p. 12 (providing screenshot of 20 thumbnails without identifying which, if any, Perfect 10 asserts as infringed). Nor does it adequately identify the location of allegedly-infringing materials, instead providing only screenshots with embedded URLs, many of which are truncated, top-level domains, or otherwise incomplete. *See*, *e.g.*, Grigorieva Decl. ¶¶ 12, 19.

### 3. Sample Notice 3 is Defective

Sample Notice 3 is also defective. This also is a fragment of a notice. *See* pp. 11-12, *supra*. It also fails to adequately identify the copyrighted works. *See* Grigorieva Decl. ¶ 20; Kassabian Decl. Ex. E ("I have attached authorized images of **some of the models** whose images are being infringed . . . .") (emphasis added); Zada Decl. Ex. 4, p. 6 (providing screenshot of 16 thumbnails without identifying which, if any, Perfect 10 asserts are infringed). Indeed, the image on the screenshots of alleged infringements is not even included amongst the screenshot of copyrighted works, and thus, Perfect 10 has not even demonstrated that it owns the image in question. Zada Decl., Ex. 3 at 3, 6. Nor does it adequately identify the location of allegedly infringing materials, for the same reasons discussed above. *See* Grigorieva Decl. ¶ 20; Kassabian Decl. Ex E.

1    Sample Notice 3 is also deficient because even though Perfect 10's cover email accuses only

2    "yandex.com Image Search[]" and "search-on-image" functions of infringement, buried within the

3    screenshots of URLs were a few URLs associated with user-generated content hosted on Yandex.

4    *See* Kassabian Decl. Ex. E; Byvshih ¶¶ 12-13; Grigorieva Decl. ¶¶ 12-13, 20.  Perfect 10's failure to

5    direct its notice to Yandex's customer support department for hosted content services, and its failure

6    to even mention that it was complaining about those services, renders it defective as well.

7         **C.    The Enormous Burden Yandex Incurred to Process These Defective Notices**
              **Confirms That the Notices Do Not Comply with the DMCA**

8

9    Despite the plainly defective nature of Perfect 10's notices, Yandex nevertheless sought to

10   process them as completely and expeditiously as possible.  To do so, Yandex had to (1) review the

11   cover letter; (2) determine precisely which Yandex services were complained of (itself a daunting

12   task because the cover letters did not properly disclose this information); (3) try to glean which of

13   the many purportedly copyrighted images submitted by Perfect 10 were allegedly infringed;

14   (4) given the volume, construct a custom computer program to extract each URL from the

15   thousands of pages of PDF screenshots, where possible; (5) re-review and manually log any fully-

16   visible URLs that could not be extracted  (6) manually review the same; and (7) attempt to locate

17   the specific pages on which allegedly infringing images appeared where Perfect 10 provided

18   incomplete or top level domain name URLs.  Grigorieva Decl. ¶¶ 12-17; Byvshih Decl. ¶¶ 12-16.

19   Through its efforts, Yandex was able to suppress 54 discernible URLs in Sample Notice 1, 55

20   discernible URLs in Sample Notice 2, and 55 discernible URLs in Sample Notice 3, along with an

21   additional seven containing complained of user generated content.  Grigorieva Decl. ¶¶ 18-20;

22   Byvshih Decl. ¶19.  This process was extremely burdensome and time consuming.  Grigorieva

23   Decl. ¶¶ 12, 14-16; Byvshih Decl. ¶ 16 .  That Yandex had to incur such a burden in processing

24   these notices underscores their deficiency under the DMCA.  Perfect 10's obfuscatory notices

25   violate not just the letter, but the spirit, of the DMCA's notice-and-takedown provisions.  *See*

26   *CCBill*, 488 F.3d at 1112-13 (finding notice inadequate because it required the provider to sift

27   through thousands of pages and compile thousands of locations to enter into web browser);

28   Kassabian Decl., Ex. B (*Perfect 10/Google* July 26, 2010 Order at 16-25 (rejecting notice as

1   deficient where it required an ISP to jump through multiple hoops with respect to thousands of

2   asserted images)).[7]

3       **D.      Yandex's Good Faith Efforts To Process P10's Defective Notices Does Not
                  Render Them Compliant**

4

5       Perfect 10 contends that Yandex's processing of the sample notices renders them compliant.

6   Not so.  That Yandex sought to process Perfect 10's deficient notices cannot and does not alter the

7   fact that those notices do not comply with the DMCA.  *See Hendrickson v. eBay, Inc.*, 165 F. Supp.

8   2d 1082, 1092 (C.D. Cal. 2001) (explaining that processing a defective notice and removing

9   complained-of content "out of an abundance of caution" does not render the plaintiff's notice

10  compliant with the DMCA); *cf. CCBill*, 488 F.3d at 1112 n.4 (that recipient of deficient notice

11  "could have found the infringing photographs" using that deficient notice is "beside the point").

12      The law "place[s] the burden of policing copyright infringement – identifying the potentially

13  infringing material and adequately documenting infringement – squarely on [Perfect 10]."  *CCBill*,

14  488 F.3d at 1113; *see Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1155-56 (N.D. Cal.

15  2008).  Absent proper notice or actual knowledge of infringement, service providers are under no

16  obligation to respond in any fashion.  *See CCBill*, 488 F.3d at 1113.  In spite of the deficiencies in

17  Perfect 10's notices and the burden to Yandex of cobbling together a list of allegedly-infringing

18  URLs, Yandex blocked access to thousands of images.  *E.g.*, Grigorieva Decl. ¶¶ 15-16.  This fact,

19  which Perfect 10 admits, should not expose Yandex to liability.  Were that the rule, no ISP would

20  ever process an even potentially-deficient notice.  *See* Section V, *infra*.

21      Perfect 10's assertion that its notices must be DMCA-compliant because other ISPs and

22  third parties have authored and/or processed "similar" notices likewise is makeweight.  Assuming

23

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [7]   Perfect 10's reliance on *Arista Records, Inc. v. MP3Board, Inc.*, 2002 WL 1997918, at *9

25  (S.D.N.Y. Aug. 29, 2002) – a distinguishable case that Perfect 10 unsuccessfully cited in its
    campaign against *Google* – is inapposite and in any event cannot trump the Ninth Circuit's later,

26  binding holding in *CCBill*.  At issue in the *Arista* decision were 662 identified links, a far cry from
    the more than 70,000 Perfect 10 claims to assert here.  Given the emphasis in the Ninth Circuit on

27  not unduly burdening ISPs, that a less-burdensome notice was found compliant says precisely
    nothing about whether Perfect 10's sprawling notice campaign comports with the DMCA.

28

1   that other ISPs have processed similar Perfect 10 notices,[8] that they did so to the best of their

2   abilities reflects only their effort not to embolden an already-vexatious litigant.  Even if the actions

3   of other ISPs were relevant here – and they are not – self-defense does not a compliant notice make.

4   Tellingly, Perfect 10 cites nothing to support its positions.

5   **IV.   YANDEX IS IN COMPLIANCE WITH THE REGISTERED DMCA AGENT
             REQUIREMENT**

6

7        Perfect 10 asks this Court to hold that Yandex is not eligible for safe harbor as a matter of

8   law for the period of time before it officially registered agents with the United States Copyright

9   Office.  But neither the statute nor the case law interpreting it imposes such a rule.  Because Yandex

10  both (1) has a registered agent pursuant to § 512(c)(2) and (2) had a functional agent prior to

11  officially registering with the Copyright Office, Perfect 10's motion should be denied.

12       **A.   The DMCA Requires Only That Yandex Have a Designated Agent – and It Does**

13       All that section 512(c) requires is that a service provider have a designated agent.  17 U.S.C.

14  § 512(c)(2) ("The limitations on liability established in this subsection apply to a service provider

15  only if the service provider has designated an agent to receive notifications of claimed infringement

16  . . . .").  Yandex Inc. and Yandex LLC both provided an agent.[9]  If Congress wanted the agent

17  requirement to operate as a strict cutoff, it could have said as much.  In fact, the DMCA

18

19      [8]  Perfect 10's contentions that these other ISPs processed notices "similar" to those sent to
    Yandex is conjecture, not evidence.  Aside from a handful of unauthenticated emails purportedly

20  received by Dr. Zada from certain of the identified ISPs, Perfect 10 offers no evidence to support its
    assertions.  Rather, Perfect 10 appears to base its statements on Dr. Zada's use of the referenced

21  sites.  But because search results are not static, that particular content may or may not appear at a
    particular URL or in search results does not mean that the ISP has processed the same.

22      [9]  Yandex N.V. does not operate a Yandex-branded search engine or host any content, and thus

23  does not have, and has no need for, a designated DMCA agent.  Indeed, Perfect 10 has failed to
    present any facts at all suggesting that Perfect 10's claims against Yandex N.V. are viable,

24  including based on an alter-ego theory (which the Court previously concluded was the only possible
    basis that Yandex N.V. could be liable to Perfect 10 – *see* Dkt. 76 at 2-3).  Perfect 10 does not even

25  claim to have sent any DMCA notices to Yandex N.V., and it also expressly excludes Yandex N.V.
    from its argument that the defendants had "actual knowledge" of infringement for purposes of

26  Perfect 10's contributory infringement claim.  *See* p.22, *infra*.  Perfect 10 has therefore provided no
    grounds for the Court to even consider the DMCA issues raised by this motion with respect to

27  Yandex N.V., and certainly no grounds to grant any aspect of this motion against Yandex N.V.

28

1   contemplates an ongoing, cooperative process,[10] and substantial compliance with the DMCA's

2   prerequisites is all that is required – a standard that Yandex has satisfied given the circumstances.

3       The face of the statute makes clear an agent's purpose:  "to receive notifications of claimed

4   infringement described in paragraph (3)."  *Id*.  The other requirements of subsection (c)(2) ensure

5   the agent's purpose can be realized (*e.g.*, listing the agent's name, address, and phone number).

6   Congress dictated that the statute be practically – not formalistically – applied by officially stating

7   that subsections (c)(2) and (c)(3) are to be governed by a "substantial compliance standard."  House

8   Report at 56 ("The Committee intends that the substantial compliance standard in new subsections

9   (c)(2) and (c)(3) be applied so that technical errors . . . do not disqualify service providers and

10  copyright owners from the protections afforded under subsection (c).").  Congress also made clear

11  that "substantial compliance" was a standard of function, not form:  "[T]he parties will comply with

12  the *functional* requirements of the notification provisions –such as providing sufficient information

13  so that a designated agent or the complaining party submitting a notification may be contacted

14  efficiently."  Sen. Rep. No. 105-190, 105th Cong., 2d Sess. (May 11, 1998) (emphasis added).

15      Yet Perfect 10 asks this Court to read into the statute a temporal requirement as a matter of

16  law, which would foreclose the possibility of evaluating substantial compliance in certain situations,

17  including in this case.  Perfect 10 asks this Court to hold that section 512 (c)(2) means an agent

18  *must* be appointed *before* safe harbor can apply, instead of the more plausible interpretation that

19  leaves room for a defendant that was substantially complying to receive safe harbor, as long as it

20  made the effort to formally comply upon reason to believe it was required to do so.  Perfect 10

21  suggests a hyper-technical reading that would change a court's inquiry from a holistic evaluation

22  into a fact-finding quest to determine *when* each specific requirement was satisfied, which is what

23  Congress was trying to avoid.  Perfect 10 wants to benefit from a lower "substantial compliance"

24

25

---

26      [10]  *See Report of the House Committee on Commerce on the Digital Millennium Copyright Act
    of 1998* ("House Report"), H.R. Rep. No. 105-551, at 49 (July 22, 1998) ("Title II preserves strong

27  incentives for service providers and copyright owners to cooperate and detect and deal with
    copyright infringements that take place in the digital networked environment.").

28

1   standard for one aspect of the DMCA (the notice requirements), while denying Yandex the benefit

2   of that same standard for another aspect.  Perfect 10 may not have its cake and eat it too.

3       **B.      Perfect 10's Motion Is Bereft of Support**

4           Perfect 10 cites just a single decision for its argument:  a preliminary injunction ruling in

5   *Datatech Enterprises LLC v. FF Magnat Ltd.*, 2012 WL 4068624 (N.D. Cal. Sept. 14, 2012).   But

6   that ruling is of no help to Perfect 10.  In *Datatech*, Judge Breyer noted, in granting a preliminary

7   injunction, that plaintiff Datatech had a high likelihood of success on the merits for a number of

8   reasons, including the fact that the defendant – a defunct peer-to-peer file sharing website – had not

9   designated an agent during a period of time when more than 12,000 infringements were alleged, and

10  was thus ineligible for safe harbor under section 512.  *Id.* at *4.  However, on the same day that

11  Perfect 10 filed its brief here, Judge Breyer ***denied*** Datatech's motion for partial summary judgment

12  on this exact issue.  *See Datatech Enters.*, No. 3:12-cv-04500-CRB, Dkt. 97 at 5 (N.D. Cal. Mar.

13  13, 2013) ("The parties further debate the facts and law concerning whether [defendant] not only

14  provided the relevant information to the Copyright Office but also made it available on its website. .

15  . . [T]hose issues involve more factual disputes about the dates that certain information was or was

16  not posted . . . making the issue inappropriate for summary judgment at this time.").  To the limited

17  extent that *Datatech* ever supported Plaintiff's position, it no longer does so, and instead provides

18  precedent for this Court to deny partial summary judgment on the issue.

19          Perfect 10 offers no other authority, controlling or otherwise, to support its argument that

20  Yandex is ineligible for immunity before the date it formally registered an agent in the U.S.  To the

21  extent this issue has been raised in other cases, the defendants have either not contested it (because,

22  unlike Yandex, they had no functional agent before the date in question), or the courts have ignored

23  or rejected the issue.  For example, in *Viacom, International, Inc. v. YouTube, Inc.*, the plaintiff

24  presented Perfect 10's same argument:  "On top of these requirements, Defendants also essentially

25  conceded that for the period before October 21, 2005, they did not meet the DMCA's requirement

26  that they register their designated agent to receive takedown notices with the Copyright Office. . . .

27  Therefore, Defendants are not entitled to the DMCA defense for the period before October 21,

28  2005."  No. 07-cv-02103-LLS, Dkt. 284 at 45 n.24 (S.D.N.Y. May 21, 2010).  But the *YouTube*

1  court gave no credence to the argument, and conferred the safe harbor to YouTube for the entire

2  period.  *See id.*, 718 F. Supp. 2d 514, 529 (S.D.N.Y. 2010) ("Defendants are granted summary

3  judgment that they qualify for the protection of 17 U.S.C. § 512(c), as expounded above, against all

4  of plaintiffs' claims"), *partially vacated on other grounds*, 676 F.3d 19 (2d Cir. 2012).[11]

5          **C.     Perfect 10 Omits The Glaring Fact That It Did Send, And Yandex Did Receive,
                 Its Purported Notices**

6

7          Finally, Perfect 10 conveniently omits that it *did* send, and Yandex *did* receive, the

8  purported notices at issue before Yandex formally designated an agent with the Copyright Office.

9  Yandex's processing of those notices was well underway before the agent designation dates, Perfect

10  10's misdirection of those notices notwithstanding.  *See*, *e.g.*, Grigorieva Decl. ¶¶ 12-15, 25.

11  Perfect 10's claim that summary judgment is proper because "prior to registering their DMCA

12  agents, Defendants could not receive notification of claimed infringement," is a mere fiction.

13          Yandex substantially complied with § 512 (c)(2) before it formally registered with the U.S.

14  Copyright Office.  Yandex provided copyright holders an avenue to complain about alleged

15  infringements – an avenue that complied with Russian law.  *Id.* ¶¶ 6-8.  Perfect 10 knows this, as it

16  submitted many complaints to Yandex before Yandex appointed an agent in the U.S.  *See*, *e.g.*,

17  Notices 1, 2, & 3.  Yandex has provided an email address, as well as a user feedback form, for user

18  complaints for many years.  Grigorieva Decl. ¶¶ 7-8 & Exs. A, B.  In October 2011, a user could

19  contact Yandex about complaints related to search through one of two official channels:  (i) by

20  emailing support@search.yandex.comsupport@search.yandex.comsupport@search.yandex.com

21

22          [11]  *Hendrickson* exemplifies courts' preference for giving weight to functional compliance with
the DMCA rather than formal, technical interpretations of its elements.  There, the plaintiff argued

23  that eBay did not satisfy the technical requirements of identifying a designated agent "until
recently" because it identified a department and not an individual to receive such notices.  165 F.

24  Supp. 2d at 1092 n.13.  The court rejected such a hyper-formalist interpretation of the DMCA,
noting that "at all relevant times, eBay advised Plaintiff that the notices of infringement should be

25  submitted to" a particular department, and its emails to the plaintiff included the address and fax
number of that department.  *Id.*  The court concluded that such functional efforts at compliance

26  were sufficient, and noted that "[n]othing in the DMCA mandates that service providers must
designate the name of a person."  *Id.*  Likewise, nothing in the DMCA mandates that safe harbor is

27  unavailable at any time until an agent is formally lodged with the Copyright Office.

28

(for yandex.com) and support@search.yandex.ru (for yandex.ru); or (ii) by filling out a relevant feedback request form. *Id.* ¶ 8. Perfect 10, instead of using either of those two options for contacting Yandex, instead sent complaints to an internal email address used by Yandex engineers, noc@yandex.netnoc@yandex.netnoc@yandex.net. *Id.* ¶¶ 9-10. ***Even after Yandex registered a formal agent with the Copyright Office***, Perfect 10 ***still*** did not send its notices to Yandex's designated agent's email addresses. *Id.* ¶ 25. Instead, for reasons unknown to Yandex, Perfect 10 continued corresponding with the noc@yandex.runoc@yandex.runoc@yandex.ru email address, *see* Mot. at 4, instead of using the agent's email address. Perfect 10's persistence in using the noc@yandex.runoc@yandex.runoc@yandex.ru email address caused confusion and delay in Yandex's removals team's receipt of the notices, as that team believed that U.S. copyright owners would contact it at its registered email address. *See* Grigorieva Decl. ¶¶ 9-10; 25. It is disingenuous for Perfect 10 to now claim that Yandex, by virtue of not having a registered agent, was not in receipt of Perfect 10's notices, when Perfect 10 did not even send the notices to the registered agent once an agent was officially registered. The fact that Perfect 10 continued to communicate its complaints – and that those complaints led to the complained of images being blocked – through noc@yandex.runoc@yandex.runoc@yandex.ru, even ***after*** being provided with the proper email addresses, further confirms that Yandex did, in fact, have an effective agent to bring it within the safe harbor provision. It was Perfect 10's knowingly misdirected submissions that were defective.

Perfect 10 does not claim that these notices vanished into a black hole. *Cf. Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004) (denying AOL's motion for summary judgment on DMCA defense because there was "ample evidence in the record that suggests that AOL did not have an effective notification procedure in place at the time" of the alleged infringements). nfringing activities were taking place"), or that Yandex failed to respond to them. To the contrary, Yandex responded on multiple occasions. *E.g.*, Zada Decl. ¶¶ 10-11. Perfect 10's form-over-substance argument should be rejected. At a minimum, there are material questions of fact as to whether Yandex's compliance with the prerequisites of the DMCA was substantial and reasonable,

1   such that summary adjudication on this issue should be denied.  *See Datatech Enters.*, No. 3:12-cv-

2   04500-CRB, Dkt. 97 at 5 (N.D. Cal. Mar. 13, 2013).

3   **V.      PERFECT 10'S DEFECTIVE NOTICES DID NOT CONFER "ACTUAL
           KNOWLEDGE" OF INFRINGEMENT**

4

5            Finally, Perfect 10 argues that even if its three sample notices are defective under the

6   DMCA, they nevertheless imparted "actual knowledge" of infringement upon Yandex LLC and

7   Yandex Inc. for purposes of contributory liability, because the notices were processed.  Mot. at 21.[12]

8   Perfect 10's argument has no support in the DMCA and should be rejected.

9        **A.      A Defective DMCA Notice Does Not Evidence An ISP's "Actual Knowledge"**

10           While Perfect 10 cites extensively to various subsections of the DMCA's notice

11   requirements, it conveniently omits Section 512(c)(3)(B)(i), which states unequivocally that:

12           *a notification from a copyright owner* or from a person authorized to act on behalf
           of the copyright owner *that fails to comply substantially with the provisions of*
13           *subparagraph (A) shall not be considered* under paragraph (1)(A) *in determining*
           *whether a service provider has actual knowledge* or is aware of facts or
14           circumstances from which infringing activity is apparent.

15   17 U.S.C. § 512(c)(3)(B)(i) (emphases added).  It is axiomatic that because a defective DMCA

16   notice (like those sent by Perfect 10 here) may not even be *considered* in deciding whether a service

17   provider has actual knowledge, it most certainly does not constitute *definitive proof* of such

18   knowledge sufficient to permit summary adjudication against the service provider.  *See*

19   *Hendrickson*, 165 F. Supp. 2d at 1093 (because the "Plaintiff's written notifications do not comply

20   substantially with" the DMCA, "the Court does not consider those notices when evaluating the

21   actual or constructive knowledge prong of the safe harbor test").

22   ───────────────────
     [12]   Perfect 10's motion for summary adjudication on this claim is expressly limited in several
23   respects.  First, Perfect 10 moves only against defendants LLC and Inc.  *See* Mot. at 21.  Second,
     Perfect 10 does not seek summary adjudication on the second element of its claim for contributory
24   copyright infringement.  *See Perfect 10 v. Amazon.com*, 487 F.3d 701, 727-28 (9th Cir. 2007)
     (contributory liability found only where the defendant (1) has actual knowledge that specific
25   infringing material is available using its system and (2) can take simple measures to prevent further
     damage to copyrighted works, yet declines to do so).  Third, Perfect 10 moves only on LLC's and
26   Inc.'s alleged "actual knowledge" of the "specific instances of infringement" purportedly identified
     in Perfect 10's three "Sample Notices" – *i.e.*, the 46 instances in Sample Notice 1, the 26 instances
27   in Sample Notice 2, and the 40 instances in Sample Notice 3.  *See* Mot. at 22-23.

28

Of course, Perfect 10 knows this already, having lost this issue before.  *See CCBill LLC*, 488

F.3d at 1113 ("Since Perfect 10 did not provide effective notice, knowledge of infringement may

not be imputed to [the defendants] based on Perfect 10's communications."); Kassabian Decl., Ex.

B (*Perfect 10/Google* July 26, 2010 Order at 11, 25 (noting Google's argument that "P10's notices

of infringement were defective for a multitude of reasons and that Google nonetheless expeditiously

processed numerous notices in circumstances where it was feasible to do so," yet finding that

Perfect 10's defective notices "do not impute knowledge to Google").  Even the lone authority

Perfect 10 cites to support its argument holds the same – that the two defective DMCA notices the

plaintiffs sent in that case "fell short of the DMCA's standard in providing [defendant] MP3Board

with knowledge of infringement."  *Arista Records*, 2002 WL 1997918 at *8.[13]

And just as defective notices themselves are not evidence of actual knowledge of

infringement, nor do an ISPs good faith efforts to process such defective notices evidence that

knowledge.  *See Hendrickson*, 165 F. Supp. 2d at 1092 (defendant's removal of content "out of an

abundance of caution" in response to defective DMCA notice did not constitute knowledge of

infringement); Kassabian Decl., Ex. B (*Perfect 10/Google* July 26, 2010 Order at 12-25 (no actual

knowledge conferred to Google from Perfect 10's defective notices despite Google's good faith

efforts to process those notices).  Rather, just as "Congress could not have intended for courts to

hold that a service provider loses immunity under the safe harbor provision of the DMCA because it

engages in acts that are specifically required by the DMCA," *Hendrickson*, 165 F. Supp. 2d at 1094,

nor could Congress have intended to bestow an even worse fate – an automatic finding of liability

---

[13]   Nor do courts interpret "actual knowledge" under the DMCA as imposing a higher standard of proof than "actual knowledge" for contributory liability.  To the contrary, a failure to prove that a purported notice of infringement conferred actual knowledge under the DMCA necessarily means that those same notices do not confer actual knowledge for contributory liability.  *See, e.g., Rosen v. Hosting Services, Inc.*, 771 F. Supp. 2d 1219, 1222 (C.D. Cal. 2010) ("Because the [DMCA] notice is defective, as a matter of law, [the defendant] cannot be charged with having the requisite knowledge to be contributorily liable.").  If anything, "actual knowledge" under the DMCA is a less rigorous standard because it only requires proof that the service provider had knowledge of a *claim* of infringement, whereas knowledge under the contributory liability standard requires that the service provider subjectively knew "that specific infringing material is available using its system." *Amazon.com*, 487 F.3d at 729.  If a defective DMCA notice fails to provide notice of even a *claim* of infringement, it certainly does not prove knowledge of an actual infringement.

on the merits of a contributory liability claim – upon a service provider who in good faith attempts to process a defective notice.  To hold otherwise would discourage the very conduct Congress meant to encourage in passing the DMCA – the expeditious identification and removal of infringing material.  *Hendrickson v. Amazon.Com, Inc.*, 298 F. Supp. 2d 914, 917 (C.D. Cal. 2003).[14]

**B.      Even If Perfect 10's Sample Notices Were DMCA-Compliant, They Cannot Establish Yandex LLC's And Inc.'s "Actual Knowledge" As A Matter of Law**

Perfect 10 suggests that, if the Court finds its three sample notices to be DMCA-compliant, "they would necessarily have conferred actual knowledge of infringement for the purposes of Perfect 10's contributory liability claim."  Mot. at 21.  Perfect 10 is incorrect.  Even if Perfect 10's notices were ***not*** defective (and they are), even a *valid* DMCA notice does not prove an ISPs actual knowledge.  *See UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 2013 WL 1092793, *10 n.12 (9th Cir. March 14, 2013) ("Proper DMCA notice under 17 U.S.C. § 512(c)(3) provides only a *claim* of infringement, and is not necessarily sufficient by itself to establish actual or 'red flag' knowledge." (emphasis in original)).  Moreover, LLC and Inc. have proffered evidence that they did ***not*** have actual knowledge of the alleged infringement of Perfect 10's copyrights.  *E.g.*, Grigorieva Decl. ¶ 26.  Thus, at a minimum, there are triable issues as to whether the sample notices conferred actual notice of infringement upon LLC and Inc., and Perfect 10's motion fails for this reason too.

---

[14]    Perfect 10 argues that Yandex should be "precluded from even arguing" that the sample notices "failed to provide them with actual knowledge" because Yandex allegedly failed to "advise" Perfect 10 of the deficiencies in these notices.  Mot. at 23.  Perfect 10 is wrong on the facts and the law.  *See* Zada Decl. Ex. 6; *see also* 17 U.S.C. § 512(c)(3)(B)(ii); *CCBill LLC*, 488 F.3d at 1113 (the "DMCA notification procedures place the burden of . . . identifying the potentially infringing material and adequately documenting infringement . . . squarely on the owners of the copyright.").

1

## Conclusion

2          For the foregoing reasons, Perfect 10's motion for partial summary judgment/summary

3  adjudication should be denied in full.

4  DATED: April 1, 2013                    QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
5

6

7                                          By
                                               Diane M. Doolittle
8                                              Rachel Herrick Kassabian
                                               Attorneys for Specially Appearing
9                                              Defendant Yandex N.V.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28